### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| CATERPILLAR INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 99-CV-1201 |
| ) | |
| STURMAN INDUSTRIES, INC., ODED E. ) | |
| STURMAN and CAROL K. STURMAN, ) | Judge Michael M. Mihm |
| ) | |
| Defendants. ) | |
| _____ ) | |
| ) | |
| STURMAN INDUSTRIES, INC., and ODED E. ) | |
| STURMAN, ) | |
| ) | |
| Counter-Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| CATERPILLAR INC., ) | |
| ) | |
| Counter-Defendant. ) | |

## ORDER

On May 31 and June 1, 2006, the Court held an evidentiary hearing to consider evidence on the question of whether the equities preclude assignment of the Sturmans' '329 and '987 patents to Caterpillar. During that hearing, the Court held that Caterpillar was entitled to specific performance of the Joint Development Agreement ("JDA") and that the evidence presented did not demonstrate that the equities preclude the assignment of the patents. This Order follows to provide a more detailed discussion of the reasons for the Court's ruling.

As the Court previously indicated, the normal remedy for breach of contract is an award of damages; however, specific performance is an equitable remedy that comes into play when damages are an inadequate remedy. Miller v. LaSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir. 1996); Schwinder v. Austin Bank of Chicago, 348 Ill.App.3d 461, 809 N.E.2d 180, 195 (1st Dist. 2004). "Specific performance is a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of a particular case." Id. at 196, *citing* Omni Partners v. Down, 246 Ill.App.3d 57, 614 N.E.2d 1342, 1345 (2nd Dist. 1993). The court must balance the equities between the parties and may decline to grant specific performance where the remedy would cause a peculiar hardship or inequitable result. Id.

"[P]atentable discoveries are the legitimate subject of contracts to assign, and . . . with certain limitations, action for specific performance lies for failure to execute the assignment required by the contract." Gas Tool Patents Corporation v. Mould, 133 F.2d 815, 818 (7th Cir. 1943). To obtain specific performance, a plaintiff must prove: (1) the existence of a valid, binding, and enforceable contract; (2) that plaintiff has complied with the terms of the contract or is ready, willing, and able to perform it's part of the contract; and (3) defendant has failed to perform or refused to perform its part of the contract. Dixon v. City of Monticello, 223 IllApp.3d 549, 585 N.E.2d 609, 618 (4th Dist. 1991).

These elements have been satisfied here. The parties agreed and stipulated that the JDA was a valid, binding and enforceable contract. Additionally, the jury found that the Sturmans breached ¶ 6.1 of the JDA, which provided:

> With respect to INTELLECTUAL PROPERTY made or conceived by ANESCO personnel, either alone or with others (a) pursuant to the PROGRAM or (b) resulting from or based on

> CATERPILLAR'S PROPRIETARY INFORMATION, ANESCO agrees to: . . . (b) assign (and ANESCO hereby assigns) to CATERPILLAR all rights to such INTELLECTUAL PROPERTY, to Applications for Letters Patent, and to Letters Patent granted upon such INTELLECTUAL PROPERTY; and © acknowledge and deliver to CATERPILLAR (without charge to CATERPILLAR but at the expense of CATERPILLAR) such written instruments and to do such other acts as may be necessary in the opinion of CATERPILLAR to obtain and maintain Letters Patent and to vest the entire right and title in same and in the WORKS in CATERPILLAR.

This verdict necessarily included findings that Caterpillar had performed all material obligations required of it under the JDA, that the '329 and '987 patents were "granted upon INTELLECTUAL PROPERTY that was made or conceived pursuant to the PROGRAM or resulting from or was based on CATERPILLAR'S PROPRIETARY INFORMATION", and that the Sturmans did not satisfy their obligations under the contract by failing to assign these patents.

The question to be determined at the hearing was whether the totality of the circumstances indicated that the assignment of the patents would cause a peculiar hardship or inequitable result for the Sturmans and third parties. Although other evidence was presented concerning the purported benefit or lack of benefit to Caterpillar if the patents are assigned, the key evidence with respect to the equities of assignment consisted of the testimony of Patrick Charbonneau ("Charbonneau"), Roger Blakely ("Blakely"), Carol Sturman ("Mrs. Sturman"), and Joaquin Gehres ("Gehres").

Charbonneau, Vice President of Government Relations for International, testified that between 1995 and 2004, International invested approximately $500 million and 1,000 man

years in G2[1] technology.  Charbonneau further testified that engines containing the G2 fuel system currently account for almost all of International's U.S. engine sales and that if International was barred from continuing to produce engines utilizing the G2 technology, four plants and approximately 4,300 employees would be adversely affected.  Sub-suppliers, dealers, servicers, and end users would also be impacted by the resulting unavailability of replacement parts.

On cross-examination, it was established that research and development on the G2 technology did not cease after the filing of the Complaint in this action in 1999.  To the contrary, International entered into a joint venture with Siemens to produce the G2 injectors in 1999 and invested in the construction of Siemens' South Carolina production facility in 2000.  Despite the jury verdict in favor of Caterpillar in 2002, production of G2 did not stop; to the contrary, G2 went into production in V-8 engines and was first offered to the public in 2002.  Nor did G2 production stop as a result of the initial assignment of the '329 and '987 patents ordered by Judge McDade in 2003.  Rather, in 2004, International began production to utilize G2 technology in its I-6 fuel injectors, as well.  The verdict by the second jury in 2005 finding that the Sturmans had breached the assignment clause in the JDA did not stop production, and Charbonneau admitted that there were no plans to either shut down the four International plants or lay off any of the employees if an assignment was ordered today.

Moreover, Charbonneau testified that International and Siemens have already made plans to change the entire fuel system for the V-8 engines from the G2 injectors to high pressure common rail systems for the 2007 model year.  This decision was made several

---

[1] According to the evidence presented during the evidentiary hearing, the G2 is the second generation HEUI injector that allegedly utilizes or practices the inventions claimed in the '329 and '987 patents.

4

years ago to address emission and sound levels; costs for this changeover are already being incurred and will be incurred regardless of whether the '329 and '987 patents are assigned to Caterpillar. Finally, Charbonneau acknowledged post-assignment statements to International's investors in the company's 10-Q filings to the effect that the claims in this proceeding and related proceedings "will not have a material adverse impact on its business, results of operations or financial condition of the company" and that one option for avoiding the potential problems associated with ceasing production of the G2s would be to pay a license fee to Caterpillar to utilize the technology.

Blakely, the Sturmans' patent attorney, then testified that had he been asked to take different actions in preparing and prosecuting the '329 and '987 patents, he would have seen that those instructions would have been carried out. Although the relevance of this testimony was somewhat unclear, the Court presumes the point to have been that had the Sturmans known that Caterpillar would claim ownership of the '329 and '987 patents in their entirety, they could have modified the claims in the applications or filed separate applications for the 3- or 4-way valves in order to remove these applications from Caterpillar's reach.

Mrs. Sturman testified that they began working with International on improving the operation of HEUI injectors in mid to late 1993. Prove-out work continued in 1994 and 1995 and culminated in the two companies entering into a joint venture in 1996 (hereinafter referred to as "SES"). To prepare for the joint venture, she quit her full-time job in real estate to focus on the commitment to International. The Sturmans had to purchase land for the construction of a new facility, build, furnish, and equip the new facility, move into the new facility, and hire employees to work on the project that would ultimately culminate in commercial production. At peak in 1999 and 2000, the Sturmans had approximately 180

5

employees. The Sturmans received substantial loans from International to facilitate this process and purchase an equity interest in SES.

Pursuant to an agreement with International, the Sturmans receive a royalty for every injector that Siemens makes for International. This income produces funds for repayment of the loans from International, and if the production of G2 injectors is stopped, Mrs. Sturman testified that the Sturmans might not be able to repay the loans. If International then called the loans, she indicated that they would lose everything. The Sturmans also received income from other ongoing development projects with International. After the initial assignment was ordered in 2003, International cut that business by 50% in the first year, and then eliminated that business entirely the next year. They were forced to layoff employees and today employ less than 70 people.

Mrs. Sturman testified that their company's entire business plan is founded on this technology. They have invested a lot of time and energy in creating a special environment and culture dedicated to this product and what it could do for the environment. Assignment of the patents would cause them to lose all of the production investment that has been made, as well as cause personal devastation to both the Sturmans and their employees. There would also be a set-back to efforts to increase environmental friendliness in the industry and to find ways of using alternative fuels.

On cross-examination, Mrs. Sturman conceded that ¶ 7.1 of the JDA gave the Sturmans an exclusive license to use the disputed technology in all fields except for the field of fuel systems for diesel engines. Applications of this technology outside of the field of fuel systems for diesel engines would therefore not appear to be precluded even if the '329 and '987 patents are assigned to Caterpillar. Moreover, in a December 2005 article in the

Colorado Springs Gazette, Mrs. Sturman stated that they no longer use the disputed patents in most of the products that they are developing. Rather, the valves that they are developing are "quite different" from the design covered by the '329 and '987 patents.

Pursuant to a sub-license agreement with International, the Sturmans will receive their royalty of $1.00 per injector manufactured by Siemens "regardless of whether or not such joint venture injector incorporates any aforementioned patent, copyright, trade secret, confidential information and/or other intellectual property of Sturman." In other words, the Sturmans will continue to receive the royalty payment regardless of whether the injectors made by Siemens actually use any of the disputed technology through 2012 when the agreement expires. As such, the assignment of the patents does not jeopardize the Sturmans' receipt of what has been an approximately $3 million per year royalty.

The SES joint venture also receives a separate manufacturing fee of $1.82 per injector, the Sturmans' share of which is approximately $1.00 per injector. This manufacturing fee "shall be due and payable to SES regardless of whether or not such joint venture injector incorporates any aforementioned patent, copyright, trade secret, confidential information and/or other intellectual property of Sturman." The receipt of this additional fee that has amounted to roughly $3 million per year through 2012 is likewise unaffected by the assignment of the '329 or '987 patents.

Gehres is the finance manager for Siemens Diesel Technology ("SDST"), the joint venture formed between International and Siemens in March 1999 to manufacture diesel fuel injectors; 99% of the people working at SDST came on at some point after 2000. Production of the G2s for V-8 engines began in 2002, with production of the G2s for I-6 engines starting in 2003-2004. SDST did not stop production as a result of the jury verdict

in 2002, the assignment of the '329 and '987 patents ordered in 2003, or the jury verdict in 2005. Nor does SDST have any present plans to shut down production; they will continue to manufacture G2s until someone orders them to stop.

Gehres testified that SDST is currently making injectors at a rate of approximately 2.7 to 2.9 million per year. If production of the G2s for the I-6 engines was completely stopped, SDST would have stranded equipment worth approximately $10 million and employees with no work to perform, as well as $12 to $15 million in lost profits from the ongoing business. Gehres further testified that there would be about $20 million in unamortized equipment and 100 staff members affected if the production of G2s for the V-8 engines was stopped. However, the equipment losses identified with respect to the V-8 engines appear to be inevitable regardless of whether the patents are ultimately assigned to Caterpillar, as SDST has plans to shift production of the V-8 injectors from G2 to HPCR by the end of this year, and the equipment is not interchangeable. Gehres then clarified that the V-8 employees will simply be transferred to work on the new product rather than laid off. Finally, International has agreed to indemnify Siemens as a result of any patent infringement action, cost of design change that might be required, or any licensing fee that might become necessary.

Also relevant to this inquiry is a substantial amount of evidence that was presented during the trial in this matter regarding Caterpillar's failure to assert its rights more quickly and aggressively, Caterpillar's alleged misrepresentations regarding its interest in or rights to the technology, Caterpillar's conduct in negotiating the release to the JDA, Caterpillar's disinterest in commercially developing the technology, and the reasonableness of the Sturmans' reliance on Caterpillar's representations. Such evidence is incorporated as if set forth fully herein. This evidence was presented in the context of the Sturmans' statute of

8

limitations defense on the trade secret misappropriation claim, as well as in their equitable estoppel defense. At trial, the jury specifically rejected the argument that Caterpillar was equitably estopped from pursuing its breach of contract claim, and the jury's finding, while not dispositive, is certainly informative.

During the course of this hearing, it became clear that some of the claimed harm, namely the past layoffs of Sturman employees, loss of ongoing development projects with International, and fundamental change in the Sturmans' business plan, has already occurred as a result of prior proceedings in this case. As such, the harm from these past events has already occurred and no further inequity or undue hardship will follow as a result of any assignment ordered by the Court at this time.

It also became clear that in order for the majority of the alleged harm to occur, at least two conditions precedent in addition to the assignment must be satisfied. The harm testified to in this hearing will not result solely from the assignment of the '329 and '987 patents or any action taken by this Court. In order for International and Siemens to lose their investments, lose sales, strand equipment and employees, become unable to supply dealers, etc., Caterpillar would have to go to court and successfully obtain an injunction prohibiting the further production of the G2 injectors. Even then, the harm could be avoided if International and/or Siemens were to enter into a licensing agreement with Caterpillar to permit the use of the technology. Thus, in order for the third parties to be harmed by the assignment of the patents, they would not only have to be enjoined from further production of the G2 injectors, but also fail to obtain a license to use the technology from Caterpillar. Under these circumstances, the harm claimed to third parties is simply too speculative and removed to justify a finding that the assignment of these patents would result in undue

hardship to International and/or Siemens. In fact, it occurred to the Court that the equitable presentation that was made here would be more appropriately addressed to the court presiding over the infringement action if Caterpillar seeks an injunction.

Likewise, given Mrs. Sturman's representation that they no longer use the disputed technology and have essentially moved their research and development projects with other companies in a different direction that is either non-infringing or would be covered by the exclusive licence granted to them in ¶ 7.1 of the JDA, any legitimate financial harm alleged by the Sturmans also rests largely on the satisfaction of these two conditions precedent. Even then, the guarantees in the sub-license agreement assure a continued flow of royalties and manufacturing fees to the Sturmans regardless of whether or not the injectors produced utilize technology covered by the '329 and '987 patents. While the assignment of the patents might be the first in a chain of events that could ultimately impact the portion of this income represented by the I-6 production, the majority of this income appears to be assured by the change in production to HPCR systems for V-8 engines. The fact that this non-infringing production will replace the production of G2 injectors in the V-8 program effectively means that the Sturmans will continue to receive their royalties and manufacturing fees through 2012 even if the patents are assigned to Caterpillar and production of the G2 injectors is enjoined.

Both Caterpillar and the Sturmans have brought proceedings in other venues seeking to enforce any rights that they might have if assignment of the patents is ordered. To comment further on these proceedings or what the results in these proceedings might be would be advisory. Moreover, history has revealed that the assignment of the patents will not cause International and/or Siemens to cease production of the G2 injectors. To the

contrary, the record indicates that production continued even after the initial assignment was ordered in 2003, and International has agreed to indemnify Siemens for any losses incurred in connection with this dispute. Given this history, it is not surprising that both Charbonneau and Gehres testified that production would not cease if an assignment is ordered today. Rather, production will continue unless and until Caterpillar obtains a court order directing them to cease all production of injectors that infringe on its rights under the '329 or '987 patents and declines to enter into a financially profitable licensing agreement.

While it is undisputed that the Sturmans and International were engaged in product development and moving toward production of the G2 injectors prior to the filing of the Complaint in this case, the evidence indicates that the Sturmans were aware that the ownership of this technology was disputed as early as 1994. Although there were negotiations back and forth and occasions when it appeared that the dispute might be amicably resolved, the fact that Caterpillar claimed ownership of the technology should have been apparent by the time that Caterpillar obtained its '901 patent in 1996. The evidence also indicates that International was included in communications and correspondence referencing this dispute in 1995 and 1996 and was clearly aware of the dispute by November 20, 1998, when International entered into the Consent Agreement to pay the costs of any legal challenges against the Sturmans by Caterpillar. Thus, International had knowledge of the dispute prior to entering into the joint venture to produce the G2 injectors with Siemens in 1999, and neither International nor Siemens have claimed to have been innocent bystanders in this process. To the extent that there could have been any doubt that Caterpillar claimed ownership of the '329 and '987 patents, all doubt was erased by the

filing of Caterpillar's Complaint in this action in June 1999, yet the Sturmans, International, and Siemens all continued down the path of G2 development and production.

The Court is not unsympathetic to the Sturmans' position and does not doubt the sincerity of their personal investment in and belief that they are the rightful owners of the technology covered by the '329 and '987 patents. That being said, the Court's sympathy cannot change the findings of the jury, the law of the case, or applicable precedent to achieve a more compassionate result. By proceeding despite their knowledge that the ownership of the technology embodied in the '329 and '987 patents was disputed, the Sturmans, International, and Siemens assumed the risk that it might ultimately be determined that Caterpillar was the rightful owner of the patents.

Consideration of the totality of the facts and circumstances in this case compels the conclusion that the Sturmans have not demonstrated that they or their customers will suffer an undue hardship by assigning the patents to Caterpillar or that the assignment would be inequitable. The Court must therefore conclude that equity does not require that the Sturmans be relieved of the consequences of their assuming this risk by allowing them to avoid their obligations under the JDA that they concede is valid and enforceable. Accordingly, for the reasons set forth herein, as well as those previously set forth in the Court's Order dated February 22, 2006, the Court finds that it is appropriate to exercise its

discretion and grant Caterpillar's request for specific performance in the form of the assignment of the '329 and '987 patents.

ENTERED this 7th day of June, 2006.

>  s/ Michael M. Mihm
>  Michael M. Mihm
>  United States District Judge